# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

May 09, 2017

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 15-14971-P
Case Style: Anthony Boyd v. Warden, Holman CF, et al
District Court Docket No: 2:14-cv-01017-WKW

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call David L. Thomas at (404) 335-6171.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: David L. Thomas
Phone #: 404-335-6161

OPIN-1 Ntc of Issuance of Opinion

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14971
_____

D.C. Docket No. 2:14-cv-01017-WKW


ANTHONY BOYD,

Plaintiff - Appellant,

versus

WARDEN, HOLMAN CORRECTIONAL FACILITY,
ATTORNEY GENERAL OF ALABAMA,
JEFFERSON S. DUNN,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(May 9, 2017)

Before TJOFLAT, MARCUS and WILSON, Circuit Judges.

MARCUS, Circuit Judge:

It is by now clear in capital cases that a plaintiff seeking to challenge a state's method of execution under the Eighth Amendment of the United States Constitution must plausibly plead, and ultimately prove, that there is an alternative method of execution that is feasible, readily implemented, and in fact significantly reduces the substantial risk of pain posed by the state's planned method of execution.  Appellant Anthony Boyd, an Alabama death row inmate, appeals the district court's dismissal of his federal civil rights lawsuit challenging the constitutionality of Alabama's lethal injection protocol.  Boyd filed this lawsuit pursuant to Section 1983, alleging, among other things, that Alabama's new lethal injection protocol, which substituted midazolam hydrochloride for pentobarbital as the first of three drugs, violates his Eighth Amendment right to be free from cruel and unusual punishment.  Notably, however, he did not allege that execution by a lethal injection protocol generally is unconstitutional.  Currently, Alabama law provides inmates sentenced to death with a choice between two methods of execution: lethal injection or electrocution.  Instead of identifying an alternative method of lethal injection that would be feasible, readily implemented, and substantially less risky than the midazolam protocol or opting for death by electrocution, however, Boyd alleged that Alabama should execute him by hanging or firing squad.

The district court determined that Boyd had failed to state a claim under the Eighth Amendment because Boyd's proposed alternative methods of execution -- firing squad and hanging -- are not authorized methods of execution under Alabama law and, therefore, are neither feasible nor readily implementable by that state.  It further held that Boyd's remaining claims challenging Alabama's execution protocol, the execution facilities, and the state's decision to keep certain information about the protocol secret were time-barred by the statute of limitations. Finally, the district court ruled that amending these claims would be futile and dismissed Boyd's complaint.

We agree with the district court that Boyd has not come close to pleading sufficient facts to render it plausible that hanging and firing squad are feasible, readily implemented methods of execution for Alabama that would significantly reduce a substantial risk of severe pain.  The Alabama legislature is free to choose any method of execution that it deems appropriate, subject only to the constraints of the United States Constitution.  But Boyd has not alleged that either lethal injection in all forms or death by electrocution poses an unconstitutional risk of pain.  Having authorized two unchallenged methods of execution, Alabama is under no constitutional obligation to experiment with execution by hanging or firing squad.  We also agree that Boyd's remaining claims were filed well beyond

the two-year statute of limitations governing § 1983 claims in Alabama.

Accordingly, we affirm.

## I.

## A.

The facts of the kidnapping and murder that Boyd committed have been laid

out by the Alabama Court of Criminal Appeals.  See Boyd v. State, 715 So. 2d

825, 832 (Ala. Crim. App. 1997).  On July 31, 1993, Boyd and three accomplices

kidnapped Gregory Huguley, who owed them $200.00 for cocaine they had given

him several days earlier.  Id.  The four men forced Mr. Huguley into a van at gun-

point and drove him to a park, making a stop at a gas station to purchase some

gasoline in a plastic container.  Id.  They then made him lie down on a bench;

bound his hands, mouth, and feet with duct tape; and then taped him to the bench,

ignoring his repeated pleas for mercy and his promises to repay them.  Id.  One of

the men, Shawn Ingram, doused Huguley in gasoline, leaving a two-foot trail of

gasoline leading away from the bench where he was bound.  Id.  Ingram then lit the

trail of gasoline that led to Huguley, causing him to catch fire.  Id.  The four men

watched Huguley burn for ten to fifteen minutes, and as he burned, he rolled over a

few feet.  Id.  Huguley died as a result of his injuries.  Id.

After trial in Talladega County, Alabama, a state jury convicted Boyd of

murder made capital because it occurred during the course of a kidnapping in the

first degree, and recommended by a vote of 10-2 that a death sentence be imposed. Id. at 831–32.  After conducting a separate sentencing hearing, the trial court followed the jury's recommendation and sentenced Boyd to death by electrocution. Id. at 832.  Boyd's conviction and death sentence were affirmed on direct appeal, see id. at 852, aff'd sub nom. Ex parte Boyd, 715 So. 2d 852 (Ala. 1998), cert. denied, Boyd v. Alabama, 525 U.S. 968 (1998), and his Rule 32 petition for state post-conviction relief was denied, see Boyd v. State, 913 So. 2d 1113 (Ala. Crim. App. 2003), cert. denied, No. 1030438 (Ala. May 27, 2005).  Boyd then sought federal habeas corpus relief in the United States District Court for the Northern District of Alabama.  The district court denied his habeas petition; we affirmed, see Boyd v. Comm'r, Ala. Dep't of Corr., 697 F.3d 1320 (11th Cir. 2012); and the United States Supreme Court denied certiorari review, see Boyd v. Thomas, 133 S. Ct. 2857 (2013).

## B.

When Boyd was sentenced to death in 1995, Alabama executed inmates by electrocution.  See McNair v. Allen, 515 F.3d 1168, 1171 (11th Cir. 2008).  On July 31, 2002, however, the Alabama legislature changed the state's method of execution to "lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution."  Ala. Code § 15-18-82.1(a).  The legislature allowed inmates already under a sentence of death at that time a 30-day

window to choose electrocution as their method of execution, after which time they would be deemed to have waived the right to request a method other than lethal injection.  Id. § 15-18-82.1(b).  The method-of-execution statute further provides that "[i]f electrocution or lethal injection is held to be unconstitutional by the Alabama Supreme Court under the Constitution of Alabama of 1901, or held to be unconstitutional by the United States Supreme Court under the United States Constitution, or if the United States Supreme Court declines to review any judgment holding a method of execution to be unconstitutional under the United States Constitution made by the Alabama Supreme Court or the United States Court of Appeals that has jurisdiction over Alabama, all persons sentenced to death for a capital crime shall be executed by any constitutional method of execution."  Id. § 15-18-82.1(c).  The statute does not prescribe any particular method of lethal injection; the legislature left it to the Alabama Department of Corrections ("ADOC") to devise the policies and procedures governing lethal injection executions, and exempted the ADOC from the Alabama Administrative Procedure Act in exercising that authority.  Id. § 15-18-82.1(g).

The ADOC has used a three-drug lethal injection protocol since it began performing executions by lethal injection in 2002.  See Brooks v. Warden, 810 F.3d 812, 823 (11th Cir.), cert. denied sub nom. Brooks v. Dunn, 136 S. Ct. 979 (2016).  Each drug in a three-drug protocol is intended to serve a specific purpose:

the first drug should render the inmate unconscious to "ensure[] that the prisoner

does not experience any pain associated with the paralysis and cardiac arrest

caused by the second and third drugs"; the second drug is a paralytic agent that

"inhibits all muscular-skeletal movements and, by paralyzing the diaphragm, stops

respiration"; and the third drug "interferes with the electrical signals that stimulate

the contractions of the heart, inducing cardiac arrest." Baze v. Rees, 553 U.S. 35,

44 (2008) (plurality op.).  The third drug in the ADOC protocol has always been

potassium chloride, and the second drug has always been a paralytic agent -- either

pancuronium bromide or rocuronium bromide.  Brooks, 810 F.3d at 823.

However, the ADOC has changed the first drug in the protocol twice: From 2002

until April 2011, it used sodium thiopental as the first drug in the three-drug

sequence; from April 2011 until September 10, 2014, it used pentobarbital as the

first drug; and from September 11, 2014, until the present, it has used midazolam

hydrochloride as the first drug.  Id.

## C.

Boyd's present suit is one of several challenges brought by Alabama death

row inmates pursuant to 42 U.S.C. § 1983 in the Middle District of Alabama,

alleging that Alabama's current lethal injection protocol is unconstitutional.  On

October 2, 2014, less than a month after the ADOC substituted midazolam for

pentobarbital as the first drug in the lethal injection protocol, Boyd brought suit in

that court and, in December 2014, filed an amended complaint that alleged the following facts. Boyd asserts that the ADOC's switch from pentobarbital to midazolam renders it substantially more likely that he will suffer unnecessarily during the execution. Unlike pentobarbital, Boyd says, midazolam is "wholly unsuitable as the first drug in a three-drug lethal injection protocol because it will not render [him] unconscious, numb, and insensate from the administration of the painful second and third drugs, rocuronium bromide and potassium chloride." Boyd also contends that the ADOC's manner of determining whether inmates are rendered insensate to pain by the first drug -- the "pinch test" -- is "wholly ineffective" because, even if an inmate cannot feel a pinch, he may be able to feel the far more painful sensations caused by asphyxiation.

Boyd further alleges that the ADOC has kept important information concerning its lethal injection protocol secret, which prevents inmates from seeking effective judicial review of the ADOC's protocol. He says that the ADOC does not ensure that the lethal injection personnel are sufficiently trained to administer anesthesia during the execution, and that the execution team "is wholly unprepared and inadequately trained as to constitutional execution procedures." Finally, Boyd alleges that the ADOC's execution facilities are deficient because the ADOC may not have the equipment necessary to achieve and maintain venous

access in the event of a complication, and the physical condition of the execution facilities is "highly questionable."

The amended complaint asserted seven claims for relief: (I) Alabama's method of execution is cruel and unusual in violation of the Eighth Amendment because midazolam will not render him sufficiently insensate to the pain caused by the second and third drugs in the protocol; (II) Alabama's execution squad personnel are inadequately trained and, therefore, there is a substantial risk that they will err during Boyd's execution and cause him unnecessary pain and suffering, in violation of his Eighth Amendment rights; (III) Alabama's execution facility is deficient, creating a substantial risk of maladministration of Boyd's execution in violation of his Eighth Amendment rights; (IV) the Alabama Department of Corrections ("ADOC") has adopted and revised processes and procedures for carrying out executions in secret, thus preventing Boyd from effectively being able to comment on the new procedures or challenge them in court, in violation of his Fourteenth Amendment due process rights; (V) during his execution, ADOC employees will fail to perform the "pinch test" to ensure that the midazolam renders Boyd unconscious as required by Alabama's lethal injection protocol, which will violate his right to equal protection of the laws under the Fourteenth Amendment; (VI) a claim for declaratory relief that Alabama's execution protocol is unlawful; and (VII) a claim for injunctive relief enjoining

Alabama from executing Boyd or other inmates until the constitutional defects he

identified are remedied.

**D.**

The defendants moved to dismiss Boyd's amended complaint for failure to

state a claim, pursuant to Fed. R. Civ. P. 12(b)(6).  In March 2015, the district

court entered orders staying Boyd's suit, as well as the six other § 1983 lethal

injection cases pending before it, until after the Supreme Court issued its decision

in Glossip v. Gross, 135 S. Ct. 2726 (2015), a case concerning the constitutionality

of Oklahoma's lethal injection protocol.  Pursuant to the stay order, the district

court denied the defendants' motion to dismiss, affording the defendants leave to

refile the motion after the Supreme Court decided Glossip.

On June 29, 2015, the Supreme Court decided Glossip, holding that, in order

to successfully challenge a method of execution, a plaintiff must plead and prove:

(1) that the proposed execution method presents a risk that is "'sure or very likely

to cause serious illness and needless suffering,' and give rise to 'sufficiently

imminent dangers,'" Glossip, 135 S. Ct. at 2737 (quoting Baze, 553 U.S. at 50

(plurality op.)); and (2) that there is "an alternative [method of execution] that is

'feasible, readily implemented, and in fact significantly reduces a substantial risk

of severe pain,'" id. (alteration adopted) (quoting Baze, 553 U.S. at 52 (plurality

op.)).

Following the Supreme Court's decision in Glossip, the defendants renewed their motion to dismiss Boyd's amended complaint.  During briefing on the renewed motion, Boyd sought leave to file a second amended complaint.  The proposed amendation makes all of the same factual allegations contained in the first amended complaint, and includes additional allegations concerning Alabama's execution team and potential alternative methods of execution that are available to Alabama.  Regarding the execution team, Boyd claims that a member of the team was hospitalized in July 2015, and that in August 2015, two officers on the execution team abruptly quit the execution team.  He also proposes two alternatives to Alabama's current lethal injection protocol: execution by firing squad or hanging.  Boyd alleges that the legislatures in both Utah and Oklahoma have approved the firing squad as a method of execution, and that there are no impediments to Alabama obtaining the necessary materials for performing an execution by firing squad.  Furthermore, firing squad executions have a good track record of "speed and certainty for the condemned."  Moreover, Boyd says, in the alternative, Alabama could execute him by hanging, which has been approved by state legislatures as an available method of execution in Delaware, New Hampshire, and Washington, and which poses a lesser risk of pain than he faces under Alabama's current protocol.  He alleges that, like these other states, the Alabama legislature is "fully capable of" approving either firing squad or hanging

11

as a method of execution.  Notably, Boyd did not propose an alternative drug cocktail that the state could use in his execution.

On October 7, 2015, the district court granted the defendants' renewed motion to dismiss and denied Boyd's motion for leave to file a second amended complaint.  The court first addressed Boyd's motion for leave to file.  It determined that the proposed second amended complaint failed to state an Eighth Amendment method-of-execution claim in Count I because it did not propose a feasible and readily available alternative method of execution, as it was plainly required to do under controlling Supreme Court law.  The district court determined that Boyd's proposed alternatives -- firing squad and hanging -- are neither feasible nor readily available for use in Alabama because they have not been approved for use as methods of execution by Alabama's legislature.  Moreover, the court observed, Boyd's allegations that execution by firing squad or hanging entail a lesser risk of pain than Alabama's current lethal injection protocol "are nothing more than bare-bone legal conclusions unsupported by facts."  Therefore, the district court concluded, Count I of the proposed second amended complaint failed to state a method-of-execution claim and amending that claim would be futile.

The court further determined that amending the remaining six claims also would be futile because the claims, even as amended, were barred by the statute of limitations.  Relying on this Court's controlling precedent in McNair v. Allen, 515

F.3d 1168 (11th Cir. 2008), and Powell v. Thomas, 643 F.3d 1300 (11th Cir.

2011), the district court observed that Boyd's claims were subject to a two-year

statute of limitations and accrued on July 31, 2002, when Boyd became subject to

execution by lethal injection, unless there had been a "significant change" to

Alabama's lethal injection protocol that would restart the statute of limitations

clock.  The court observed that, unlike the method-of-execution challenge asserted

in Count I, Counts II and III -- challenging the training of the execution squad

personnel and adequacy of the facilities under the Eighth Amendment -- had

nothing to do with the ADOC's switch from pentobarbital to midazolam.  And, the

court said, nothing prevented Boyd from bringing these claims within two years

after he became subject to death by electrocution.

The district court similarly determined that Count IV, the due process

challenge to the secrecy of Alabama's lethal injection protocol, accrued when the

legislature changed the method of execution in 2002 because the secrecy policy

has remained unchanged since then.  Moreover, the court said, Count IV also failed

to state a due process claim under our decision in Wellons v. Comm'r, Ga. Dep't

of Corr., 754 F.3d 1260, 1267 (11th Cir. 2014), which rejected a similar challenge

to Georgia's secrecy statute.  The district court also found that Count V -- alleging

that Boyd's equal protection rights would be violated by the state's failure to

adequately perform the pinch test during his execution -- was time-barred because

Boyd did not allege any facts to establish that the claim was timely, such as by identifying recent executions in which the state had failed to perform the pinch test. And Counts VI and VII, seeking declaratory and injunctive relief, were unnecessary and repetitive of the preceding claims. Thus, the district court concluded that the proposed amendments were futile. And because the operative amended complaint was entirely subsumed by the proposed second amended complaint, the district court granted the defendant's motion to dismiss and entered final judgment in favor of the defendants.

This timely appeal followed.

## II.

We review a district court's grant of a motion to dismiss with prejudice de novo, "accepting the [factual] allegations in the complaint as true and construing them in the light most favorable to the plaintiff." Mills v. Foremost Ins. Co., 511 F.3d 1300, 1303 (11th Cir. 2008) (quotation omitted). Fed. R. Civ. P. 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific

task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

A complaint need not contain "detailed factual allegations," but must include enough facts "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (internal citation and footnote omitted). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.; see also Twombly, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."). The Supreme Court has employed a "two-pronged approach" in applying the foregoing principles: first, a reviewing court should eliminate any allegations in the complaint that are merely legal conclusions; and second, where there are well-pleaded factual allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

We generally review a district court's decision to deny leave to amend for abuse of discretion, but review de novo an order denying leave to amend on the

grounds of futility, because it is a conclusion of law that an amended complaint

would necessarily fail.  Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.,

641 F.3d 1259, 1264 (11th Cir. 2011).  An amendment is considered futile when

the claim, as amended, would still be subject to dismissal.  See Burger King Corp.

v. Weaver, 169 F.3d 1310, 1320 (11th Cir. 1999).

### III.

We proceed in two parts.  First, we address Boyd's Eighth Amendment

method-of-execution claim asserted in Count I, challenging the state's new

midazolam protocol.  Then, we address whether Boyd's remaining claims are time-

barred or otherwise fail as a matter of law.  Like the district court, we analyze the

allegations in Boyd's proposed Second Amended Complaint because, if those

allegations are insufficient as a matter of law, then so are the less thorough

allegations contained in the operative Amended Complaint.

### A.

### 1.

For state prisoners, "[f]ederal law opens two main avenues to relief on

complaints related to imprisonment: a petition for habeas corpus, 28 U.S.C. §

2254, and a complaint under the Civil Rights Act of 1871, Rev. Stat. § 1979, as

amended, 42 U.S.C. § 1983."  Muhammad v. Close, 540 U.S. 749, 750 (2004).

The federal habeas statute allows "a person in custody pursuant to the judgment of

a State court" to seek relief in federal court "only on the ground that he is in

custody in violation of the Constitution or laws or treaties of the United States."

28 U.S.C. § 2254(a). Section 2254, as amended by the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), imposes meaningful procedural

requirements on state prisoners seeking federal review of their convictions, 28

U.S.C. § 2254(b), (c), and places restrictions on a federal court's power to grant

habeas relief, 28 U.S.C. § 2254(d). Section 1983 is a broad remedial statute that

authorizes suit against any person who, under color of state law, "subjects or

causes to be subjected, any citizen of the United States . . . to the deprivation of

any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. §

1983. Read literally, § 1983 could apply to all claims alleging constitutional

violations by inmates in state custody. However, habeas and § 1983 are "mutually

exclusive" avenues for relief, and the line of demarcation between them "is based

on the effect of the claim on the inmate's conviction and/or sentence." Hutcherson

v. Riley, 468 F.3d 750, 754 (11th Cir. 2006). "Simply put, if the relief sought by

the inmate would either invalidate his conviction or sentence or change the nature

or duration of his sentence, the inmate's claim must be raised in a § 2254 habeas

petition, not a § 1983 civil rights action." Id. "Although method-of-execution

challenges brought under § 1983 are not governed by AEDPA, they do fall at the

margins of habeas, and therefore implicate many of the same comity concerns

AEDPA was designed to address." McNair v. Allen, 515 F.3d 1168, 1175 (11th Cir. 2008) (internal citation and quotation omitted).

In two cases, the Supreme Court has permitted inmates to bring method-of-execution challenges brought pursuant to § 1983. See Nelson v. Campbell, 541 U.S. 637, 643 (2004); Hill v. McDonough, 547 U.S. 573, 580 (2006). In both cases, the inmates challenged particular facets of the state's intended method of lethal injection -- in Nelson, 541 U.S. at 641–42, the plaintiff challenged the use of a painful "cut-down" procedure to gain vein access, and in Hill, 547 U.S. at 578, it was the adequacy of the first-drug in the protocol -- and conceded that the state could constitutionally execute them using other methods of lethal injection that were authorized by state law, see Nelson, 541 U.S. at 645–46; Hill, 547 U.S. at 581. Following Nelson and Hill, we have entertained method-of-execution challenges to specific aspects of a state's lethal injection protocol pursuant to § 1983. See, e.g., Jones v. Comm'r, Ga. Dep't of Corr., 811 F.3d 1288, 1295 (11th Cir.), cert. denied sub nom. Jones v. Bryson, 136 S. Ct. 998 (2016); Brooks v. Warden, 810 F.3d 812, 819 (11th Cir.), cert. denied sub nom. Brooks v. Dunn, 136 S. Ct. 979 (2016); Arthur v. Comm'r, Ala. Dep't of Corr., 840 F.3d 1268 (11th Cir. 2016), cert denied sub nom. Arthur v. Dunn, 137 S. Ct. 725 (2017).

**2.**

The Eighth Amendment to the United States Constitution provides,

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and

unusual punishments inflicted."  The prohibition against cruel and unusual

punishments protects against punishments that are "incompatible with the evolving

standards of decency that mark the progress of a maturing society" or that involve

the "unnecessary and wanton infliction of pain" on a prisoner.  Estelle v. Gamble,

429 U.S. 97, 102, 104 (1976) (quotation omitted).  A state's method of executing

condemned inmates must comport with these basic principles, but the Supreme

Court "has never invalidated a State's chosen procedure of carrying out a sentence

of death as the infliction of cruel and unusual punishment."  Glossip, 135 S. Ct. at

2732 (quotation mark omitted) (quoting Baze, 553 U.S. at 48 (plurality op.)).

The Supreme Court's decisions in cases challenging methods of execution

have been "animated in part by the recognition that because it is settled that capital

punishment is constitutional, 'it necessarily follows that there must be a

constitutional means of carrying it out.'"  Id. (alterations adopted) (quoting Baze,

553 U.S. at 47 (plurality op.)).  Debates over methods of execution involve

complex, ever-evolving scientific and medical questions, and, therefore, method-

of-execution challenges pose a risk of "embroil[ing] the courts in ongoing

scientific controversies beyond their expertise[ and] . . . substantially intrud[ing] on

19

the role of the state legislatures in implementing their execution procedures -- a role that by all accounts the States have fulfilled with an earnest desire to provide for a progressively more humane manner of death." Baze, 553 U.S. at 51 (plurality op.). To mitigate this risk and to protect the "State's legitimate interest in carrying out a sentence of death in a timely manner," id. at 61, the Supreme Court has required prisoners seeking to challenge a state's method of execution to meet a "heavy burden," id. at 53 (quotation omitted). Thus, in order to state an Eighth Amendment method-of-execution claim, a plaintiff must plead facts sufficient to establish that (1) the state's lethal injection protocol "'creates a demonstrated risk of severe pain,'" and (2) there is a "known and available" alternative method of execution that is "'feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain.'" Glossip, 135 S. Ct. at 2737 (alteration adopted) (quoting Baze, 553 US. at 52, 61 (plurality op.)); see also Jones, 811 F.3d at 1294–95; Brooks, 810 F.3d at 818–19.

As we've explained, in Count I, Boyd is challenging only a single aspect of the ADOC's current execution protocol. His sole claim is that the ADOC's switch from pentobarbital to midazolam as the first of three drugs has rendered the ADOC's protocol likely to cause a "demonstrated risk of severe pain," Glossip, 135 S. Ct. at 2737, because midazolam is a less effective anesthetic and sedative than pentobarbital. The appellees do not dispute that Boyd has alleged sufficient

facts to satisfy this first element of his Eighth Amendment claim.  The sole dispute

on appeal concerns the second element identified by the Supreme Court in <u>Baze</u>

and <u>Glossip</u>.

The first question we confront, then, is whether -- taking Boyd's allegations

as true -- he has pled sufficient factual matter to make it plausible that the firing

squad and hanging are known and available methods of execution that are feasible

for use in and can be readily implemented by Alabama.  Until recently, precedent

provided little guidance in answering this question because, each time this Court or

the Supreme Court had considered a method-of-execution challenge to a lethal

injection protocol, the plaintiffs proposed alternative methods of lethal injection.

Thus, for example, in <u>Baze</u>, the Supreme Court's discussion of the alternative

method element focused on the "comparative efficacy" of the prisoner's proposed

alternative lethal injection procedures, and did not discuss whether the alternatives

were feasible or readily implemented.  <u>See</u> <u>Baze</u>, 553 U.S. at 56–61 (plurality op.).

And in <u>Glossip</u>, the Supreme Court held that the plaintiffs had failed to satisfy their

burden to identify a "known and available alternative method of execution"

because the record showed that Oklahoma had been unable to obtain the drugs

necessary for the plaintiffs' proposed alternative single-drug execution protocol

"despite a good-faith effort to do so."  <u>Glossip</u>, 135 S. Ct. at 2738.  Similarly, our

decisions applying this element focused on the feasibility of obtaining the drugs

necessary for the alternative lethal injection protocols proposed by the plaintiffs.
See Jones, 811 F.3d at 1295 (finding that the plaintiff's allegation that Georgia
could "obtain their drugs from a different source" insufficient to satisfy this
element); Brooks, 810 F.3d at 820 (finding that the plaintiff had failed to show a
substantial likelihood that pentobarbital "is available to Alabama now");
Gissendaner v. Comm'r, Georgia Dep't of Corr., 779 F.3d 1275, 1283 (11th Cir.)
(faulting the plaintiff for failing to plead "an alternative drug that would
substantially reduce the risks she identifies with compounded pentobarbital" as
well as "an alternative means of procuring that alternative drug"), cert. denied sub
nom. Gissendaner v. Bryson, 135 S. Ct. 1580 (2015).

In Arthur v. Comm'r, Ala. Dep't of Corr., 840 F.3d 1268 (11th Cir. 2016),
cert denied sub nom. Arthur v. Dunn, 137 S. Ct. 725 (2017), this Court considered
for the first time a method-of-execution challenge to a lethal injection protocol that
proposed as its alternative a completely different method of execution.  Thomas
Arthur challenged the use of midazolam in Alabama's three-drug lethal injection
protocol, and proposed as alternatives single-drug protocols of compounded
pentobarbital or sodium thiopental.  Id. at 1276–77.  But he also sought leave to
amend his complaint to add the firing squad as an additional execution alternative.
Id. at 1277.  The district court denied Arthur leave to amend, concluding that
"execution by firing squad is not permitted by [Alabama] statute and, therefore, is

not a method of execution that could be considered either feasible or readily

implemented by Alabama at this time." Id.  We affirmed that denial; we said that

Arthur had not met his burden to show that "execution by firing squad," which was

not authorized by statute, "[wa]s a feasible, readily implemented, and significantly

safer alternative method of execution when compared to" the authorized and

unchallenged methods of lethal injection and electrocution.  Id. at 1315.  We are

bound by that precedent here, and conclude that, like Arthur, Boyd has failed to

carry his burden of pleading facts sufficient to plausibly suggest that execution by

firing squad or hanging is feasible or readily implementable in Alabama.

The concurring opinion agrees that we are bound by Arthur, but believes that

case was incorrectly decided.  We disagree for these reasons.

Glossip's second prong requires that a proposed alternative method of

execution be "known and available" -- or, as the Court also puts it, "feasible[ and]

readily implemented." See Glossip, 135 S. Ct. at 2737 (quoting Baze, 553 U.S. at

52, 61 (plurality op.)).  This requirement plainly imposes real, practical limitations

on the acceptable alternative methods of execution that a prisoner can plead in

order to state a claim for an Eighth Amendment method-of-execution challenge.

"Feasible" means "capable of being done, executed, or effected."  Webster's Third

New International Dictionary 831 (2002).  And "readily" means "with fairly quick

efficiency," "without needless loss of time," "reasonably fast," or "with a fair

23

degree of ease." Id. at 1889.[1]  Moreover, the method of execution must be feasible and readily implemented for the state seeking to carry out the execution.  See Jones, 811 F.3d at 1295; Brooks, 810 F.3d at 820.  Accordingly, for a proposed method of execution to satisfy Glossip's second prong, the state must be able to implement and carry out that method of execution relatively easily and reasonably quickly, and in a manner that "in fact significantly reduces a substantial risk of severe pain" relative to the intended method of execution.  Glossip, 135 S. Ct. at 2737 (alteration adopted quotation omitted).

Often, courts are confronted only with factual issues in addressing whether an alternative is sufficiently feasible and readily implementable to satisfy Glossip's second prong -- for instance, that is generally the case when a plaintiff challenges a state's lethal injection protocol and proposes some modification to that protocol as an alternative.  Thus, in Glossip, the plaintiffs had alleged that Oklahoma could use a single-drug lethal injection protocol instead of its intended three-drug protocol, and the only question the Supreme Court asked was whether, as a matter of fact, Oklahoma could obtain the necessary alternative drugs.  See id. at 2738.  But Boyd has injected a distinct legal question into our analysis of this element (along with factual ones) by proposing an alternative method of execution that, under present

---

[1] Generally, "[w]ords are to be understood in their ordinary, everyday meanings." Alberts v. Royal Caribbean Cruises, Ltd., 834 F.3d 1202, 1204 (11th Cir. 2016) (quoting Antonin Scalia & Bryan A. Garner, Reading Law 69 (2012)).  "To determine the ordinary meaning of a term, courts often turn to dictionary definitions for guidance." Castillo v. U.S. Atty. Gen., 756 F.3d 1268, 1273 (11th Cir. 2014) (quotation omitted).

conditions, appears unavailable to the ADOC under the state's method of
execution statute.  Considering the legal obstacles that would prevent the ADOC
from carrying out Boyd's execution by hanging or firing squad, as well as the
many factual deficiencies in Boyd's pleading, we have little trouble concluding
that Boyd has failed to state an Eighth Amendment claim.

For starters, neither hanging nor firing squad is a currently lawful method of
execution in Alabama.  Therefore, a state trial court would be without any
authority to order Boyd to be executed by firing squad or hanging, just as the
ADOC would be without authority to execute Boyd by either method, without the
Alabama legislature fundamentally rewriting the state's method-of-execution
statute or one of the courts named in the statute striking down as unconstitutional
either electrocution or lethal injection.  See Arthur, 840 F.3d at 1316.  Again,
Alabama's method-of-execution statute allows all persons sentenced to death to
choose between two methods of execution, providing that death sentences "shall be
executed by lethal injection, unless the person sentenced to death affirmatively
elects to be executed by electrocution."  Ala. Code § 15-18-82.1(a) (emphasis
added).  Only if "electrocution or lethal injection is held to be unconstitutional by
the Alabama Supreme Court . . . [or] the United States Supreme Court . . . , or if
the United States Supreme Court declines to review any judgment holding a
method of execution to be unconstitutional . . . made by the Alabama Supreme

25

Court or the United States Court of Appeals that has jurisdiction over Alabama"
can the ADOC carry out Boyd's execution by "any constitutional method of
execution." Id. § 15-18-82.1(c).  But, as the parties readily concede, neither
electrocution nor lethal injection has been declared unconstitutional by this Court,
the Alabama Supreme Court, or the United States Supreme Court.  Moreover, in
this suit, Boyd brings a narrow challenge to a single aspect of Alabama's new
lethal injection protocol and does not argue or even suggest that lethal injection is
per se unconstitutional -- in fact, the very premise of his attack on the midazolam
protocol is that it is more painful than the prior Alabama protocol using
pentobarbital.  Also, notably, he does not challenge the constitutionality of death
by electrocution, or allege any facts establishing that electrocution involves a
substantial risk of severe pain.  Therefore, even if we were to agree with him that
the midazolam protocol poses a substantial risk of serious harm, the ADOC would
not be able to carry out Boyd's death sentence by hanging or firing squad without
the Alabama legislature fundamentally rewriting its method-of-execution statute.
See Arthur, 840 F.3d at 1316.

Boyd alleges, however, that, since the Oklahoma and Utah legislatures have
approved death by firing squad and the Delaware, New Hampshire, and
Washington legislatures have approved death by hanging, the Alabama legislature
could easily do the same.  But Boyd "misunderstands the state's obligation under

the Eighth Amendment." Id.  States that continue to have capital punishment may

choose any method of execution they deem appropriate, subject only to the

constraints of the United States Constitution.  Id.  Boyd argues that under the

district court's reading of the law a state could effectively negate the protections of

the Eighth Amendment simply by enacting a method-of-execution statute that

provides for only a single method of execution -- even if that method "creates a

demonstrated risk of severe pain," Glossip, 135 S. Ct. at 2737 (quotation marks

omitted) -- thereby preventing challengers from identifying a statutorily authorized

alternative method.  We rejected this argument in Arthur.  See Arthur, 840 F.3d at

1317.  In that case, we acknowledged that "if a state's sole method of execution is

deemed unconstitutional, while other methods remain constitutional (even if they

are not authorized by state statute), our inquiry into whether those other options are

feasible and readily implemented would be a different one." Id. at 1319.  But,

notably, "the Alabama legislature has authorized two methods of execution --

lethal injection in any form and electrocution -- and neither of its authorized

methods has been deemed unconstitutional." Id. at 1317–18.  Even if Boyd's

allegations about the midazolam protocol prove true, it would not entitle him to

veto the Alabama legislature's choice as to how Alabama inmates will be executed

because there would still be other statutorily authorized (and wholly unchallenged)

methods available.  "Absent a showing that Alabama's chosen methods of

execution present an unconstitutional risk of severe pain, Alabama is under no

obligation to deviate from its widely accepted, presumptively constitutional

methods in favor of [Boyd's] retrogressive alternative[s]." Id. at 1318.

As we explained in Arthur, in considering whether Boyd's proposed

alternatives are "feasible" and "readily implemented," it is also important to note

that hanging and firing squad are vastly different methods of execution from

electrocution and lethal injection -- the only methods of execution that Alabama

has employed in the past ninety years. See id. Hanging was an available method

of execution in Alabama until 1927, when the legislature passed a statute providing

electrocution as the sole method of execution. See Bachelor v. State, 113 So. 67,

72 (Ala. 1927). And, as far as we can tell, Alabama has never carried out an

execution by firing squad or statutorily recognized it as a method for carrying out

executions.

Moreover, while it is technically true that a handful of states have authorized

executions by hanging and firing squad, lethal injection is still the primary method

of execution in each of those states, as it is in every state that allows for capital

punishment. Delaware law provides that "[p]unishment of death shall, in all cases,

be inflicted by [lethal injection]." Del. Code. tit. 11, § 4209(f). Only if lethal

injection "is held unconstitutional by a court of competent jurisdiction" does the

statute allow for execution "by hanging by the neck." Id. Similarly, New

Hampshire law provides that an inmate must be executed by lethal injection, and may only be executed by hanging "if for any reason the commissioner [of corrections] finds it to be impractical to carry out the punishment of death by [lethal injection]." N.H. Rev. Stat. § 630:5(XIV). Washington law also provides that executions "shall be inflicted by [lethal injection] . . . or, at the election of the defendant, by hanging by the neck." Wash. Rev. Code § 10.95.180(1).

Utah law provides that "lethal injection is the method of execution" for all defendants "sentenced to death on or after May 3, 2004," Utah Code § 77-18-5.5(1), but allows for execution by firing squad if "a court holds that a defendant has a right to be executed by firing squad," id. § 77-18-5.5(2), "a court holds that lethal injection is unconstitutional on its face" or "as applied," id. § 77-18-5.5(3), or "the sentencing court determines the state is unable to lawfully obtain the substance or substances necessary to conduct an execution by lethal intravenous injection," id. § 77-18-5.5(4). And Oklahoma law provides for firing squad as the quaternary option for carrying out an execution, making it available only after execution by lethal injection, nitrogen hypoxia, and electrocution are all declared unconstitutional. See Okla. Stat. tit. 22, § 1014. Thus, none of these states provide for hanging or firing squad as a primary method of execution, and they generally only make either of those methods available if certain contingencies are satisfied. And, indeed, Boyd's complaint does not so much as allege that any of these states

29

have actually used hanging or firing squad to carry out executions.  Boyd has given

us no indication of how often these methods are actually used, nor has he told us

when the last time anyone was hung or shot by an American jurisdiction.  This sits

in stark contrast to the numerous executions by lethal injection that are carried out

across the country each year.  The fact that a few other states could theoretically

carry out an execution by hanging or firing squad without violating their own laws

tells us nothing about whether the methods are, in fact, readily implementable for

use in actual executions in Alabama today.

The Supreme Court has recognized that requiring a state to amend its

method-of-execution statute or to authorize a variance from that statute "impos[es]

significant costs on the State and the administration of its penal system."  Nelson,

541 U.S. at 644.  That is particularly true where, as here, the necessary amendment

would retreat from a method of execution that is employed by the overwhelming

majority of states that still authorize the death penalty and is widely considered the

"most humane available," and would replace it with methods of execution that

have long been abandoned by almost every state in this country.  See Baze, 553

U.S. at 62 (plurality op.).  As the Supreme Court has recognized, "[t]he firing

squad, hanging, the electric chair, and the gas chamber have each in turn given way

to more humane methods[ of execution], culminating in today's consensus on

lethal injection."  Id.; see also id. at 42 ("A total of 36 States have now adopted

lethal injection as the exclusive or primary means of implementing the death penalty, making it by far the most prevalent method of execution in the United States."); Furman v. Georgia, 408 U.S. 238, 296–97 (1972) (Brennan, J., concurring) ("Our practice of punishing criminals by death has changed greatly over the years.  One significant change has been in our methods of inflicting death.  Although this country never embraced the more violent and repulsive methods employed in England, we did for a long time rely almost exclusively upon the gallows and the firing squad.  Since the development of the supposedly more humane methods of electrocution late in the 19th century and lethal gas in the 20th, however, hanging and shooting have virtually ceased.").  Having authorized two unchallenged methods of execution to inmates under sentence of death, the Alabama legislature is under no obligation to make this type of regressive change to Alabama's method-of-execution statute, and there is nothing offered by way of fact in Boyd's pleading to suggest that the ADOC could execute him by hanging or firing squad given the current state of Alabama law.[2]

---

[2] It is also not clear that Boyd's proposed second amended complaint contained sufficient factual allegations to establish that the ADOC could readily carry out an execution by hanging.  See Iqbal, 556 U.S. at 678.  He claims, only at the highest order of generality and without any factual development, that hanging is feasible and readily implementable by the ADOC.  He says that the materials necessary are more easily obtained than are lethal injection drugs, but he provides no details about how any state carries out executions at the gallows.  He does not allege that any state has actually carried out an execution by hanging, let alone has done so recently, or that the ADOC has access to any employee or other person who would know how to effectively carry out executions with this largely forsaken method.  To be sure, it is "conceivable" that the ADOC could acquire the necessary supplies, hire experts to develop an execution protocol for

Boyd's lawsuit is one of several filed by Alabama death-row inmates to

challenge Alabama's lethal injection protocol.  After <u>Glossip</u> was decided, other

inmates amended their complaints to allege alternative lethal injection methods of

execution that Alabama could employ, and all of their complaints survived motions

---

hanging, assemble an execution team that is willing to carry out the protocol, train the team to be
able to execute the protocol in an acceptably risk-free manner, and eventually carry out an
execution by hanging, but Boyd's cursory allegations appear to fall far short of pushing his claim
"across the line from conceivable to plausible." <u>Twombly</u>, 550 U.S. at 570.  Boyd's allegations
do not seem to plausibly suggest that the ADOC could readily accomplish the steps necessary to
perform an execution by hanging.

And there is good reason to think that Boyd could not plead sufficient facts to show that
hanging "'significantly reduces a substantial risk of severe pain.'" <u>Glossip</u>, 135 S. Ct. at 2737
(alteration adopted) (quoting <u>Baze</u>, 553 US. at 52, 61 (plurality op.)).  The risks of hanging,
which include strangulation and decapitation, are well known.  <u>See, e.g.</u>, Martin R. Gardner,
<u>Executions and Indignities -- An Eighth Amendment Assessment of Methods of Inflicting
Capital Punishment</u>, 39 Ohio St. L.J. 96 (1978):

> Although hanging has become something of an art in modern times, and may well be
> painless if properly performed, evidence of bungled hangings abounds: inadvertent
> decapitation when victims are dropped too long; strangulation when they are dropped too
> short to break their necks.  Strangulation may be the rule rather than the exception.
> Unconsciousness is supposedly instantaneous even when the neck is not broken, but it is
> not entirely certain that this is true.  If the victim is conscious, death by strangulation
> must be extremely painful.

<u>Id.</u> at 120 (footnotes omitted); <u>see also</u> <u>Campbell v. Wood</u>, 18 F.3d 662 (9th Cir. 1994)
(Reinhardt, J., concurring in part and dissenting in part):

> There is absolutely <u>no</u> question that <u>every</u> hanging involves a risk that the prisoner will
> not die immediately, but will instead strangle or asphyxiate to death.  This process, which
> may take several minutes, is extremely painful.  Not only does the prisoner experience
> the pain felt by any strangulation victim, but he does so while dangling at the end of a
> rope, after a severe trauma has been inflicted on his neck and spine.  Although such a
> slow and painful death will occur in only a comparatively small percentage of cases,
> every single hanging involves a significant risk that it will occur.

<u>Id.</u> at 712.  "[D]raw[ing] on [our] judicial experience and common sense," <u>Iqbal</u>, 556 U.S. at
679, we suspect that there are no facts Boyd could have pled regarding the risks of hanging that
would be sufficient to meet his <u>Glossip</u> burden.

to dismiss and proceeded to evidentiary hearings.  See, e.g., Frazier v. Thomas, 2:13-CV-781-WKW, 2015 WL 65096 (M.D. Ala. Jan. 5, 2015).  Boyd has employed a different strategy than those other plaintiffs, alleging instead that the ADOC should employ profoundly different methods of execution that are not legal in Alabama and that have long been abandoned by states seeking to employ the "most humane" method of execution available, lethal injection.  Baze, 553 U.S. at 62 (plurality op.).  Boyd's strategic choice left him with a steep hill to climb, requiring him to plead sufficient facts to render it plausible that methods of execution that are outdated, rarely (if ever) used, and beyond the ADOC's statutory authority could be feasible and readily implemented by the ADOC.  As we see it, Boyd's allegations regarding death by hanging or firing squad fall far short of meeting the pleading burden unequivocally imposed by Glossip.  "Alabama has chosen two constitutional methods of execution," and Boyd "has not shown that they are, or that either one is, unconstitutional (per se or as applied to him)." Arthur, 840 F.3d at 1319.  Absent making this showing, Boyd "is not entitled to veto the Alabama legislature's choice of two constitutional methods of execution." Id.  Accordingly, we find that amending Count I would be futile, affirm the district court's denial of leave to amend, and affirm its dismissal of Boyd's claim.

## B.

We now turn to Boyd's remaining claims.  All constitutional claims brought under § 1983 are tort actions and, thus, are subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought.  See Wallace v. Kato, 549 U.S. 384, 387 (2007).  Alabama law creates a two-year statute of limitations for personal injury actions.  See Ala. Code § 6-2-38. Therefore, if any of Boyd's claims accrued prior to October 2, 2012 -- two years prior to the date he filed this lawsuit -- they are time barred by the statute of limitations.  The statute of limitations is an affirmative defense, so "a Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred."  La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845–46 (11th Cir. 2004) (quotation omitted).

In McNair v. Allen, we addressed when a method of execution challenge under § 1983 accrues.  Applying the general principle that "a federal claim accrues when the prospective plaintiff knows or has reason to know of the injury which is the basis of the action," we considered four possible dates on which a method-of-execution claim could accrue: (1) the date the defendant's death sentence became final; (2) the date that Alabama enacted its new lethal injection protocol; (3) the date the denial of the defendant's federal habeas petition became final; or (4) the day of the defendant's execution, "when the ultimate injury will occur."  McNair,

515 F.3d at 1173–74 (quotation omitted).  We rejected the day of the execution as the accrual date because, for § 1983 claims seeking prospective relief from a future injury, a claim accrues when the litigant knows, or should have known, all of the facts necessary to pursue a cause of action, and death-sentenced inmates plainly know enough to challenge the state's method of execution well before their execution date.  Id. at 1174–75.  And we rejected the completion of federal habeas review as the start date as well, since delaying accrual until that date "would provide capital defendants with a means of delaying execution even after their sentences have been found lawful by both state and federal courts," id. at 1175, and would "diminish the interest of states and crime victims 'in the timely enforcement of a sentence,'" id. at 1776 (quoting Hill, 547 U.S. at 584).

We held that a method of execution claim will ordinarily accrue on the "date on which a litigant's death sentence becomes final following direct appeal" for the following reasons:

> First, by requiring a defendant to wait to bring a claim after direct review is complete (as opposed, say, to when the sentence is first imposed), we ensure claims are not brought prematurely, before state courts have had an adequate opportunity to correct any infirmities in the defendant's conviction or sentence.  Second, by requiring a claim to be brought within two years of the completion of state review, we guarantee defendants' constitutional challenges to the method of their execution can be fully adjudicated and at the same time protect states from unnecessary interference in carrying out their judgments.  Finally, selecting the completion of direct appeal as the moment a § 1983 claim accrues has the added benefit of mirroring the time at which a defendant's habeas limitations period begins to run, see 28

U.S.C. § 2244(d)(1)(A), thereby simplifying the postconviction
labyrinth of filing deadlines through which capital litigants must
navigate.

Id. at 1176–77.  However, if there is a "significant change in the state's execution

protocol" after the inmate's death sentence becomes final on direct appeal, the

inmate has a new Eighth Amendment claim that accrues on the date of that

significant change.  Id. at 1177.

Thus, it is now well established that "a method of execution claim accrues

on the later of the date on which state review is complete, or the date on which the

capital litigant becomes subject to a new or substantially changed execution

protocol."  Id. at 1174; see also, e.g., Gissendaner, 779 F.3d at 1280; Wellons, 754

F.3d at 1263, cert. denied sub nom. Wellons v. Owens, 134 S. Ct. 2838 (2014);

Powell v. Thomas, 643 F.3d 1300, 1303 (11th Cir. 2011); DeYoung v. Owens, 646

F.3d 1319, 1325 (11th Cir. 2011).  However, a substantial change to a state's lethal

injection protocol doesn't create an open season on all aspects of the state's

protocol.  Rather, "a claim that accrues by virtue of a substantial change in a state's

execution protocol is limited to the particular part of the protocol that changed."

Gissendaner, 779 F.3d at 1280–81.  "In other words, a substantial change to one

aspect of a state's execution protocol does not allow a prisoner whose complaint

would otherwise be time-barred to make a 'wholesale challenge' to the State's

protocol." Id. at 1281. "[W]hether a significant change has occurred in a state's method of execution is a fact dependent inquiry." Wellons, 754 F.3d at 1263.

Boyd's conviction became final in 1998, when the United States Supreme Court denied certiorari review of his state direct appeal. See Boyd, 525 U.S. at 968; see also Pugh v. Smith, 465 F.3d 1295, 1299 (11th Cir. 2006). The statute of limitations for Boyd's method-of-execution claims had not yet began to run on that date because Alabama did not adopt lethal injection as its primary method of execution until July 31, 2002. Therefore, Boyd's constitutional challenges to execution by lethal injection "accrued on July 31, 2002, absent a later 'significant change' in the state execution protocol." Powell, 643 F.3d at 1304. We find that Boyd's claims asserted in Counts II through V of his proposed second amended complaint are barred by the statute of limitations and, therefore, affirm the district court's determination that amending them would be futile.

In Count II, Boyd alleges that the ADOC's lethal injection protocol subjects him to a substantial risk of serious harm in violation of the Eighth Amendment because the officers who will carry out his execution are inadequately trained to establish an appropriate "plane of anesthesia" throughout the lethal injection process. In Count III, Boyd alleges that the ADOC's execution facilities have deteriorated and that the ADOC lacks certain necessary equipment, and that these deficiencies create a substantial risk that his execution will not be carried out

properly in violation of the Eighth Amendment.  Boyd readily concedes that

Counts II and III are unrelated to the adoption of the new midazolam protocol, but

argues that they are timely anyway because they relate to the present training of the

execution team and the current condition of the ADOC's facilities, each of which

has substantially changed within two-years prior to filing his complaint.  We

remain unpersuaded.

In support of Count II, Boyd makes several allegations about seemingly

longstanding facets of the ADOC lethal injection protocol.  For example, he

alleges that the ADOC's protocol is unconstitutional because the ADOC fails to

"adequately ensure that the individuals responsible for inducing and maintaining

unconsciousness are credentialed, licensed and proficient in the knowledge, skills,

and procedures necessary to establish an appropriate plane of anesthesia

throughout the lethal injection process."  He makes no claim that the ADOC has

recently altered its training and credentialing requirements for members of its

execution team.  Similarly, he alleges generally that the ADOC doesn't have any

guidelines in place for the execution team to rely on in exercising its discretion

during the execution process, but does not say that this is the result of any change

to the ADOC's lethal injection practices that have been in place since 2002.

Because these allegations relate to aspects of (or deficiencies in) the ADOC's

lethal injection protocol that have been in place since July 2002, Boyd's claim that they violate the Eighth Amendment is time barred.

Boyd also alleges that recent changes in the composition of the ADOC's execution team render it unprepared to perform his execution. Boyd says that, over the course of three years, the execution team lost three members and has not performed enough training exercises. Even taking these allegations as true and drawing all reasonable inferences therefrom, we do not think that Boyd has said enough to plead a "significant change" in the ADOC's execution protocol. Indeed, apart from the alleged fact that the ADOC does not adequately train its execution team -- which, as we just explained, is time-barred from challenge -- Boyd provides no reason to think that the ADOC has not hired new team members or that these new members will be any less fit to carry out an execution than the officers they're replacing. To allow each instance of employee turnover in a state's execution team to create a new Eighth Amendment violation would render the "significant change" requirement meaningless. We agree with the district court that Count II was time barred.

In support of Count III, Boyd again offers general allegations about the conditions of the ADOC's execution facilities and the dearth of necessary equipment, as well as more specific claims about recent changes in the conditions of the facilities and equipment. Thus, for example, he alleges that the ADOC has

not demonstrated that it has the equipment necessary to achieve and maintain

venous access in the event of a complication during his execution.  This, again, is a

general allegation that is not related to any change in the ADOC's protocol,

facilities, or equipment and, therefore, is time-barred from challenge.  Boyd also

alleges that, "[s]hortly before" the new midazolam protocol was announced,

"reports indicate[d]" that the ADOC's execution chamber was in poor condition

and had suffered water damage, and that the equipment in the chamber was moved

out of place and may have been damaged.  But, apart from the conclusory

allegation that these conditions are "insufficient for performing a constitutional

execution," Boyd provides no allegations to support the inference that water

damage to the execution chamber or possible damage to certain unspecified

equipment renders it substantially more likely that his execution will be

unnecessarily painful.  Because Boyd became subject to death by lethal injection in

the William C. Holman execution chamber when the legislature amended the

method of execution in July 2002, see Ala. Code § 15-18-82, and has not provided

sufficient factual allegations to show that there has been a constitutionally

significant change to the quality of those facilities since that time, we find Count

III to be time barred as well.

In Count IV, Boyd alleges that the ADOC's secrecy surrounding its lethal

injection protocol violates his right to due process of law because it deprives him

of the information necessary to effectively enforce his Eighth Amendment rights in court.  He also alleges that the ADOC's ability to amend the protocol without affording him and other death row inmates notice and an opportunity to challenge the proposed amendments violates due process.  As we see it, Boyd's secrecy claim is time-barred because the ADOC's protocol has been protected by the same secrecy since the Alabama legislature enacted lethal injection as its method of execution on July 31, 2002.[3]  See Powell, 643 F.3d at 1305 (finding time-barred plaintiff's claim that "his rights under the Eighth and Fourteenth Amendments were violated because Alabama's private execution protocol was changed secretly and without any oversight" because "Powell could have challenged the ADOC's 'secrecy' surrounding the method of execution beginning July 31, 2002, as the facts supporting this cause of action 'should have been apparent to any person with a reasonably prudent regard for his rights'") (quoting McNair, 515 F.3d at 1177).  Boyd argues that this claim did not accrue until the new midazolam policy was announced, but his due process claim is not in any way "limited to the particular part of the protocol that changed."   Gissendaner, 779 F.3d at 1280–81.  Indeed, his complaint avers that "the type and dosage of the [ ] drugs used" in the protocol is one of the few pieces of information that Alabama does not keep secret -- so this

---

[3] The parties do not point to any rule or regulation that requires that the ADOC keep its lethal injection protocol confidential.  The "secrecy" Boyd seeks to challenge stems from the fact that, under the July 31, 2002 method-of-execution statute, the ADOC's execution protocols are exempt from the notice and comment requirements of the Alabama Administrative Procedure Act in exercising that authority.  See Ala. Code. § 15-18-82.1(g).

claim on its face does not pertain to those drugs or their replacements. Boyd

instead challenges other aspects of Alabama's execution protocol -- secrecy and

the ability to amend the protocol without affording inmates an opportunity to

comment on proposed changes -- that have been in place since lethal injection was

adopted as Alabama's method of execution on July 31, 2002. See Powell, 634

F.3d at 1305.[4]

In Count V, Boyd alleges that there is a substantial risk that the ADOC

execution team will treat him differently from other inmates by failing to perform a

"pinch test" on him during his execution, which will make it more likely that he

will be conscious when he is injected with the painful second and third drugs in the

protocol and will deny him equal protection of the laws under the Fourteenth

Amendment. We find this claim to be time-barred as well. Boyd does not allege

that the pinch test is a new component of the lethal injection protocol, nor does he

contend that some recent change to the protocol has rendered the consciousness

test less reliable. While he says that the state failed to perform a pinch test on

---

[4] The district court also held that Boyd's secrecy claim fails as a matter of law under our decision in Wellons, 754 F.3d at 1267, where we held that inmates do not have a "broad right to know where, how, and by whom the lethal injection drugs will be manufactured, as well as the qualifications of the persons who will manufacture the drugs, and who will place the catheters." Our holding in Wellons and subsequent cases, see, e.g., Jones, 811 F.3d at 1292–94, plainly bars Boyd's claim that he has a due process right to know the details of Alabama's execution protocol so he can challenge that protocol in court. However, Boyd's due process claim arguably has a distinct component -- challenging the lack of notice and comment afforded to inmates prior to amending Alabama's execution protocol -- that we have never squarely addressed. Since our decision in Powell makes clear that Boyd's due process claim is untimely, we need not and do not decide whether it is also fails to state a claim for a due process violation.

Eddie Powell prior to injecting him with the second and third drugs in the protocol, Powell's execution was in 2011, more than two years before Boyd filed his complaint.  See Arthur v. Thomas, 674 F.3d 1257, 1263 (11th Cir. 2012). Therefore, Boyd concedes that the pinch test and any associated risk was part of the execution protocol more than two years before he filed his complaint.

Even so, Boyd argues that his equal protection claim is timely because he is challenging an "ongoing circumstance" that constitutes a "continuing violation" of his right to equal protection of the laws, and that his cause of action will not accrue until the alleged unlawful conduct ceases.  However, this Court has already rejected that argument in McNair, where we recognized that a method-of-execution challenge is seeking prospective relief against a future injury, 515 F.3d at 1174, but nevertheless held that the cause of action accrues (and the statute of limitation begins to run) when "the facts which would support a cause of action should have been apparent to any person with a reasonably prudent regard for his rights," id. at 1177.  We are bound by that prior decision, see Smith v. GTE Corp., 236 F.3d 1292, 1300 n.8 (11th Cir. 2001), and we agree with the district court that this claim, too, is untimely.[5]

---

[5] On appeal, Boyd does not challenge the district court's dismissal of Counts VI and VII, seeking declaratory and injunctive relief.

43

## C.

While Boyd's case was pending on appeal, the Supreme Court decided Hurst v. Florida, 136 S. Ct. 616 (2016), holding that Florida's capital sentencing scheme ran afoul of the Sixth Amendment right to a jury trial because it enabled a judge to increase the maximum authorized penalty from life imprisonment to death "based on her own factfinding." Id. at 622. For the first time on appeal in this Court, Boyd argues that Alabama's capital sentencing scheme suffers from the same infirmity, and asks that we reform Alabama's capital sentencing scheme to comply with Hurst. We understand Boyd to be arguing that his death sentence is unconstitutional based on the Supreme Court's Hurst decision. We will not consider this claim because we have "repeatedly held that 'an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.'" Walker v. Jones, 10 F.3d 1569, 1572 (11th Cir. 1994) (quoting Depree v. Thomas, 946 F.2d 784, 793 (11th Cir. 1991)).

Moreover, Boyd's Hurst claim plainly falls within the province of habeas corpus and cannot be brought pursuant to § 1983. Habeas and § 1983 are "mutually exclusive" avenues for relief; if a claim can be raised in a federal habeas petition, "§ 1983 must yield to the more specific federal habeas statute, with its attendant procedural and exhaustion requirements." Nelson v. Campbell, 541 U.S. 637, 643 (2004). This requirement is consonant with the "explicit congressional

44

intent" that prisoners whose claims fall within the "core" of habeas corpus not be able to "evade [its] requirement[s] by the simple expedient of putting a different label on their pleadings." Preiser v. Rodriguez, 411 U.S. 475, 489–90 (1973). The line of demarcation between habeas and § 1983 "is based on the effect of the claim on the inmate's conviction and/or sentence." Hutcherson, 468 F.3d at 754. By arguing that the death sentence he received is unconstitutional in light of Alabama's capital sentencing scheme, Boyd undeniably seeks to "invalidate his . . . sentence or change the nature or duration of his sentence," and so this claim "must be raised in a § 2254 habeas petition, not a § 1983 civil rights action." Id.

The long and short of it is Boyd's proposed second amended complaint falls well short of plausibly pleading an alternative method of execution that is feasible, readily implemented, and in fact significantly less risky or painful than ADOC's current three-drug midazolam protocol and, therefore, fails to state a claim for an Eighth Amendment violation regarding the new protocol. The remainder of Boyd's claims are untimely as they were filed well beyond the two-year statute of limitations that govern § 1983 claims in Alabama. Accordingly, we affirm the district court's determination that granting Boyd leave to amend his complaint would be futile, and affirm its dismissal of Boyd's suit.

**AFFIRMED.**

WILSON, Circuit Judge, concurring in judgment:

*Arthur*[1] is binding law in this circuit, and under that precedent, we must dismiss Anthony Boyd's method-of-execution claim and ancillary due process claim. However, I dissented in *Arthur* and continue to believe it was wrongly decided. But for *Arthur*, I would reverse the district court's dismissal of Boyd's method-of-execution and due process claims. I write separately to explain why, and to note that much of the Majority opinion is dicta with which I disagree.

## I. METHOD-OF-EXECUTION CLAIM

The Majority affirms the dismissal of Boyd's method-of-execution claim based on the finding that Boyd has not sufficiently alleged an execution alternative. Boyd proposes death by firing squad as an execution alternative, but the Majority correctly determines that, under *Arthur*, § 15-18-82.1 of the Alabama Code precludes Boyd from relying on the firing squad as an alternative.[2] The Majority however does not end its analysis of Boyd's method-of-execution claim with *Arthur*'s dispositive finding—it continues to discuss the claim for several pages. *See* Maj. Op. at 23–34. That unnecessary discussion of the claim is non-binding dicta. *See Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 762 (11th Cir. 2010) (stating that dicta is language in an opinion "not necessary to the decision");

---

[1] *Arthur v. Comm'r, Ala. Dept. of Corrs.*, 840 F.3d 1268 (11th Cir. 2016), *cert. denied sub nom. Arthur v. Dunn* (*Arthur II*), 580 U.S. ___, 137 S. Ct. 725 (2017).

[2] Boyd relies on hanging as another execution alternative, but *Arthur* forecloses that alternative as well.

46

*Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("[D]icta is not binding on anyone for any purpose.").  And in that dicta the Majority suggests that Boyd's claim fails not only because of § 15-18-82.1 but also because Boyd's allegations are insufficient to support a finding that the firing squad is a practicable execution alternative in Alabama.

As I discussed in my *Arthur* dissent, I do not believe that § 15-18-82.1 precludes claimants like Boyd from relying on death by firing squad.  *Arthur*, 840 F.3d at 1321–33 (Wilson, J., dissenting).  Also, I disagree with the Majority's suggestion that Boyd's allegations about the firing squad are insufficient.  But for *Arthur*, I would allow Boyd to proceed to discovery on his method-of-execution claim.

## A. *Arthur* was wrongly decided.

In concluding that § 15–18–82.1 forecloses method-of-execution claims that rely on death by firing squad as an execution alternative, our decision in *Arthur* promulgated a startling holding: that state legislation can thwart constitutional claims for relief from cruel and unusual punishment.  *See id.* at 1327–28.  In my view, that holding is deeply flawed and *Arthur* was wrongly decided.  But rather than revisit why I believe the holding is flawed, I defer to my *Arthur* dissent and limit my discussion to developments subsequent to *Arthur* that further lament the holding.  In the short time since *Arthur* was decided, two Supreme Court justices

have expressed reservations about the holding; a court of appeals judge has penned

a concurrence that highlights the tension between the holding and the Eighth

Amendment; a district court judge has disagreed with the holding; and at least one

circuit court has departed from the holding, creating a circuit split.

Justice Sotomayor, joined by Justice Breyer, dissented to the denial of

certiorari in *Arthur*, and in the dissent, the Justices voiced serious concerns about

this court's holding in the case.  Our decision in *Arthur*, the Justices found,

"contradicts the very decisions it purports to follow—*Baze* and *Glossip*";[3] violates

the Supremacy Clause "by conditioning federal constitutional rights on the

operation of state statutes"; and risks inconsistent application of the Constitution

since, under the decision, whether a prisoner can obtain method-of-execution relief

"depends not on the Constitution but on vagaries of state law."  *See Arthur II*, 137

S. Ct. at 729–30 (Sotomayor, J., joined by Breyer, J., dissenting from denial of

certiorari).  What's more, the Justices found that the *Arthur* holding jeopardizes the

"ongoing national conversation . . . around the methods of execution the [Eighth

Amendment] tolerates."  *Id.* at 731.  That constitutionally required conversation

takes place through a dialectic exchange between courts and legislatures in which

courts examine evolving standards of decency and apply those standards to state-

execution practices.  *See id.* at 731–33.  The Justices determined that *Arthur*, by

---

[3] *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520 (2008); *Glossip v. Gross*, 576 U.S. ___, 135
S. Ct. 2726 (2015).

finding that state legislation can thwart method-of-execution claims, empowers states to "silence" that conversation.  *See id.*

Shortly after certiorari was denied in *Arthur*, Judge Stranch of the Sixth Circuit Court of Appeals cited Justice Sotomayor and Justice Breyer's dissent in a concurrence that calls attention to the tension between our holding in *Arthur* and the Eighth Amendment.  *See In re Ohio Execution Protocol*, 853 F.3d 822, 846–47 (6th Cir.) (Stranch, J., concurring), *vacated for reh'g en banc*, ___ F.3d ___ (6th Cir. Apr. 25 2017).  The concurrence highlights the constitutional dilemma posed by a holding like *Arthur*'s that allows states to muzzle the national conversation about the death penalty.

Judge Stranch stressed that the Eighth Amendment requires "a continuing dialogue" between courts, legislatures, and the American people "on the meaning of the Amendment's prohibition on cruel and unusual punishments."  *See id.* "[T]he meaning of th[e] prohibition is derived from the evolving standards of decency that mark the progress of a maturing society," and without a continuing dialogue, courts cannot fulfill their duty under the Eighth Amendment to identify, clarify, and enforce those standards.  *See id.* (internal quotation marks omitted).

Pointing to recent developments in our society that bear on the death penalty and evolving standards of decency, Judge Stranch deftly illustrated this point. Judge Stranch noted that countless drug companies in recent years have refused "to

sell execution drugs" and that this development may evidence "changing societal attitudes toward the death penalty and a conclusion . . . that the business in which drug companies engage, selling drugs that improve health and preserve life, is not consistent with selling drugs that are used to put people to death." *Id.* at 846. She also noted that a "2015 survey found that a majority of Americans prefer life without parole over the death penalty for people convicted of murder" and that the survey "matches polling in 2016 finding that public support for the death penalty has dropped below 50%, to its lowest level in 45 years." *Id.* at 847. Absent a continuing dialogue among courts, legislatures, and the American people that takes into account these types of developments, our jurisprudence and state-execution practices would inevitably become divorced from evolving standards of decency. *See Graham v. Florida*, 560 U.S. 48, 82, 130 S. Ct. 2011, 2036 (2010) (Stevens, J., concurring) ("Society changes. Knowledge accumulates. We learn, sometimes, from our mistakes. Punishments that did not seem cruel and unusual at one time may, in the light of reason and experience, be found cruel and unusual at a later time . . . .").

Following Judge Stranch's concurrence, Judge Baker of the District Court for the Eastern District of Arkansas issued an order further calling into question our court's holding in *Arthur*. In granting a preliminary injunction to halt a series of Arkansas executions, Judge Baker disagreed with the holding. *McGehee v.*

*Hutchinson*, No. 17-00179, slip op. at 80 (E.D. Ark.), *vacated on other grounds by*

*McGehee v. Hutchinson* (*McGehee II*), ___ F.3d ___, No. 17-1804 (8th Cir.) (en

banc), *cert. denied*, 581 U.S. ___, No. 16-8787 (Apr. 20, 2017).  She found "that

the Eleventh Circuit's limitation [in *Arthur*] of alternative methods [of execution]

to those presently permitted under state law finds no textual basis in *Baze* or

*Glossip*."  *See id.*

       Although the Eighth Circuit Court of Appeals, sitting en banc, vacated Judge

Baker's preliminary injunction, it agreed with Judge Baker's departure from the

*Arthur* holding:  "[W]e disagree with the legal standard that the district court

applied in determining whether alternative methods of execution are known and

available.  [However, w]e do not say that an alternative method must be authorized

by statute or ready to use immediately . . . ."  *See McGehee II*, slip op. at 6.

       These critiques of our decision in *Arthur* underscore its serious flaws.  I

suspect that as time passes the body of jurisprudence casting doubt on *Arthur* will

only continue to grow.

   **B. Boyd's allegations are sufficient.**

       Boyd is entitled to proceed to discovery if his complaint includes allegations

sufficient to support a reasonable inference that death by firing squad (1) is

"feasible [and] readily implemented" and (2) "significantly reduces a substantial

risk of severe pain."  *See Glossip*, 135 S. Ct. at 2737 (internal quotation marks

omitted); *Baze*, 553 U.S. at 52, 128 S. Ct. at 1532 (plurality opinion); *Ashcroft v.
Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).  In considering whether
Boyd's allegations satisfy these requirements, we must accept the allegations as
true.  *See Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.  We must also "draw on [our]
judicial experience and common sense" and take into account the specific
"context" surrounding the firing squad.  *See id.* at 679, 129 S. Ct. at 1950; *Roe v.
Michelin N. Am., Inc.*, 613 F.3d 1058, 1062 n.5 (11th Cir. 2010) ("[A] district court
*must* examine a claim's context and draw on the court's judicial experience and
common sense, when evaluating whether a complaint sufficiently pleads a
claim . . . ."  (internal quotation marks omitted) (emphasis in original)).

Boyd alleges:

> Both Utah and Oklahoma use or could use the firing
> squad, which makes it a known alternative.  Use of a
> firing squad based on an existing protocol from one of
> these states is "available" because there are no
> impediments to obtaining the required materials, as there
> may be for lethal injection drugs.  [Alabama] h[as]
> represented that [certain alternative lethal injection drugs]
> are not "available," and the same cannot be said for the
> materials required for a firing squad execution.  For
> instance, Utah's protocol contemplates five trained
> shooters, four of whose guns are loaded and the fifth
> loaded with a non-lethal wax bullet.  Both of these other
> states evaluated and approved the firing squad as a
> method of execution through the legislative process, as
> states, including [Alabama] are fully capable of doing.
> Use of a firing squad, a known and available alternative
> based on one of these other states' protocols, would entail
> a lesser risk of pain than the substantial risk of severe

> pain Mr. Boyd faces under Alabama's existing protocol.
> This is so even though firing squad execution—while
> more unpleasant to *observe* than lethal injections, and
> while described as "barbaric"—are viewed as having a
> record of relative speed and certainty for the condemned,
> whose constitutional rights are actually at stake.

If we set aside *Arthur*, these allegations—viewed through the lens of judicial experience, common sense, and the context surrounding death by firing squad—are sufficient to support a "reasonable inference" that the firing squad satisfies the requirements of *Baze* and *Glossip*. *See Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.

1.  Boyd's allegations support a reasonable inference that the firing squad is feasible and readily implemented.

The context specific to death by firing squad provides an important backdrop for our analysis of whether Boyd has sufficiently alleged that the firing squad is feasible and readily implemented. *See id.* at 679, 129 S. Ct. at 1950; *Roe*, 613 F.3d at 1062 n.5. "[D]rawing on our judicial experience and common sense," *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950, we know that the firing squad is a straightforward, well-known procedure that has been performed for centuries, *see Baze*, 553 U.S. at 42, 48, 128 S. Ct. at 1526, 1530; *Glossip*, 135 S. Ct. at 2732, 2739; *Wilkerson v. Utah*, 99 U.S. 130, 134–36 (1878) (holding that death by firing squad is constitutional and noting that in the nineteenth century the military "commonly" used the firing squad); *Guardian News & Media LLC v. Ryan*, ___ F. Supp. 3d ___, No. 14-02363, slip op. at 18 (D. Ariz. Dec. 21, 2016) (referring to

the firing squad as a "still-used historical execution technique[]").  We also know

that the materials necessary for the firing squad—guns and bullets—are abundant.

Finally, we know that Alabama has ready access to guns, bullets, and personnel

who are trained in firearms because Alabama is a modern militarized state with a

national guard, a department of corrections, and a police force.

Considering this context and taking Boyd's allegations as true, the

allegations support a reasonable inference that death by firing squad is "known and

available," which means the allegations support a reasonable inference that the

firing squad is feasible and readily implemented.  *See Baze*, 553 U.S. at 61,

128 S. Ct. at 1537 (equating "feasible and readily implemented" with "known and

available" when articulating the standard for method-of-execution claims);

*Glossip*, 135 S. Ct. at 2737–38 (same).

First, the firing squad itself, the possible procedures for administering the

firing squad, and the materials and personnel needed to perform the firing squad

are clearly "known."  The long history of the firing squad and the straightforward

process for implementing the firing squad compel this conclusion.

Second, Boyd's allegations make plausible his claim that the firing squad is

available to Alabama.  Boyd alleges that Utah and Oklahoma use or could use the

firing squad[4] and that no impediments exist to Alabama employing the firing squad

---

[4] Bolstering this allegation, Utah successfully carried out a firing-squad execution as

in a manner similar to those states'.  Given that Alabama, like Utah and Oklahoma, is a modern militarized state with the death penalty, that allegation is plausible. *See Wood v. Ryan*, 759 F.3d 1076, 1103 (9th Cir.) (Kozinski, J., dissenting from denial of rehearing en banc) ("There are plenty of people employed by [a] state who can pull the trigger [for a firing-squad execution] and have the training to aim true.  [And t]he weapons and ammunition are bought by the state in massive quantities for law enforcement purposes."), *vacated*, 135 S. Ct. 21 (2014).  A conclusion to the contrary would strain credulity.  Firing-squad executions were carried out in this country as early as the nineteenth century.  *See Wilkerson*, 99 U.S. at 134–36.  Surely Alabama has the capacity in the age of drones and space travel to assemble a firing squad, especially considering that Alabama could look to Utah and Oklahoma for assistance.  *See Watts v. State of Ind.*, 338 U.S. 49, 52, 69 S. Ct. 1347, 1349 (1949) (plurality opinion) ("[T]his Court should not be ignorant as judges of what we know as men.").  Indeed, Alabama has been able to assemble the equipment, personnel, and protocols needed for lethal injection—a much more complicated procedure than the firing squad.

    2.  <u>Boyd's allegations support a reasonable inference that the firing squad significantly reduces a substantial risk of severe pain.</u>

---

recently as 2010—a fact of which judicial notice can be taken at this stage in the proceedings. *See* Fed. R. Evid. 201(b), (d).

Boyd extensively alleges that Alabama's current execution method—lethal injection using midazolam—poses a substantial risk of severe pain, and Alabama does not dispute the sufficiency of those allegations.[5]  Accordingly, if Boyd has sufficiently alleged that death by firing squad does not involve such a risk, his allegations support a finding that the firing squad significantly reduces a substantial risk of severe pain.  He has done exactly that.

Boyd pleads that death by firing squad poses minimal risk of pain because it is a certain, speedy method of execution.  Taking into account judicial experience and common sense, that allegation is plausible.  The Supreme Court has remarked that "there is some reason to think that [the firing squad] is relatively quick and painless."  *See Glossip*, 135 S. Ct. at 2739 (internal quotation marks omitted); *id.* at 2797 (Sotomayor, J., dissenting) ("[F]rom a condemned inmate's perspective, . . . [the] relatively painless violence [of death by firing squad] may be vastly preferable to an excruciatingly painful death hidden behind a veneer of [lethal injection drugs.]").  Similarly, Judge Kozinski of the Ninth Circuit Court of Appeals has recognized that a firing-squad execution limits a prisoner's risk of pain.  *See Wood*, 759 F.3d at 1103 (Kozinski, J., dissenting from denial of rehearing en banc) ("The firing squad strikes me as the most promising [method of

_____

[5] Alabama would likely have difficulty challenging Boyd's allegations given that "[s]cience and experience are now revealing that, at least with respect to midazolam-centered protocols, prisoners executed by lethal injection are suffering horrifying deaths . . . ."  *See Arthur II*, 137 S. Ct. at 733 (Sotomayor, J., joined by Breyer, J., dissenting from denial of certiorari).

execution]. . . . [L]arge-caliber rifle bullets fired at close range can inflict massive damage, causing instant death every time.").[6]

## II. DUE PROCESS CLAIM

The Majority also dismisses Boyd's due process claim, finding that the claim is time barred. *See* Maj. Op. at 41–42. I do not believe the claim is time barred, but I agree with the Majority's ultimate determination that the claim is subject to dismissal.

Because Boyd's method-of-execution claim is timely, *see id.* at 3, so is his due process claim. The same two-year limitations period governs both claims, and the claims accrued at the same time. Boyd argues that the secrecy surrounding Alabama's execution protocol violates his due process rights because the secrecy denies him a fair opportunity to pursue his method-of-execution claim. Boyd's due process claim is therefore ancillary to his method-of-execution claim,[7] and it did

---

[6] Moreover, a number of scholars have opined that states should turn to death by firing squad because, among other things, it is a relatively quick and painless method of execution. *See, e.g.*, Deborah W. Denno, *The Firing Squad As "A Known and Available Alternative Method of Execution" Post-Glossip*, 49 U. Mich. J. L. Reform 749, 792–93 (2016); Alexander Vey, Note, *No Clean Hands in A Dirty Business: Firing Squads and the Euphemism of "Evolving Standards of Decency"*, 69 Vand. L. Rev. 545, 575–78 (2016); Kristen Loveland, Note, *Death and Its Dignities*, 91 N.Y.U. L. Rev. 1279, 1313 (2016); P. Thomas Distanislao, III, Note, *A Shot in the Dark: Why Virginia Should Adopt the Firing Squad As Its Primary Method of Execution*, 49 U. Rich. L. Rev. 779, 805 (2015).

[7] Citing *Wellons v. Commissioner, Georgia Department of Corrections*, 754 F.3d 1260 (11th Cir. 2014) (per curiam), and *Jones v. Commissioner, Georgia Department of Corrections*, 811 F.3d 1288 (11th Cir. 2016), the Majority suggests that Boyd has not stated a valid due process claim because a prisoner does not have a standalone right to know the details of his state's method of execution. *See* Maj. Op. at 42 n.2. However, Boyd's due process claim includes allegations that Alabama's "secrecy policy" infringes his opportunity to litigate his

not accrue until the method-of-execution claim accrued.  Boyd's due process right to be afforded "an opportunity . . . to substantiate [his method-of-execution] claim before it is rejected" could not have been infringed before his method-of-execution claim even arose.  *See Ford v. Wainwright*, 477 U.S. 399, 414, 106 S. Ct. 2595, 2604 (1986) (plurality opinion) (internal quotation marks omitted).

Even so, we must dismiss Boyd's due process claim since it is ancillary to, and thus shares the fate of, his method-of-execution claim.

## III. CONCLUSION

Although *Arthur* compels us to affirm the dismissal of Anthony Boyd's method-of-execution and due process claims, I continue to believe *Arthur* was wrongly decided.  This case highlights the tension between that decision and the Eighth Amendment.  Boyd faces a controversial method of execution— midazolam-based lethal injection—that has resulted in botched and inhumane executions, and he has identified a viable execution alternative.  Yet because of *Arthur*, Boyd cannot even access discovery.

I concur in the result only.

---

method-of-execution claim.  The claim is not based on a standalone right to execution-related information; the claim is ancillary to Boyd's method-of-execution claim and implicates established due process rights.  The "elementary rights of men" require "fairness" and "[a]n opportunity to be heard."  *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170–71, 71 S. Ct. 624, 647–48 (1951) (Frankfurter, J., concurring).  When a state policy impairs a prisoner's opportunity to litigate a constitutional claim, the prisoner can challenge the policy as part of his constitutional claim.  *See id.*  Neither *Wellons* nor *Jones* forecloses this type of ancillary due process claim.